UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re: TRUCKING & CONTRACTING SERVICES, LLC,     No. 19-11319-j11

Debtor.

## MEMORANDUM OPINION

THIS MATTER is before the Court on the Objection to Mean Oilfield, LLC's Proof of Claim, Number 28 ("Claim Objection"–Doc. 354) filed by the Debtor, Trucking & Contracting Services, LLC ("TCS"). The Court held a final hearing on the Claim Objection and took the matter under advisement. The claim of Mean Oilfield, LLC ("Mean Oilfield") is based on TCS's alleged guarantee of a debt that Mean Oilfield Carlsbad, LLC ("Mean Carlsbad") owes to Mean Oilfield. TCS asserts that it did not guarantee the debt of Mean Carlsbad because the Guaranty Agreement was signed by Melissa Acosta on behalf of Mean Carlsbad, not on behalf of TCS. Mean Oilfield counters that the signature block in the Guaranty Agreement identifying Mean Carlsbad as the guarantor is merely a scrivener's error and that the Guaranty Agreement should be reformed so that it is enforceable against TCS. Having weighed and considered the evidence in light of the applicable caselaw, the Court concludes that Mean Oilfield has not satisfied its burden of proving that the scrivener's error is the product of the parties' mutual mistake. The Court will, therefore, sustain TCS's Claim Objection and disallow Mean Oilfield's Claim No. 28.

PROCEDURAL HISTORY

TCS filed a voluntary petition under chapter 11 of the Bankruptcy Code on May 31, 2019. *See* Doc. 1. Mean Oilfield filed a proof of claim on April 14, 2021. *See* Claim 28-1. TCS objected to Mean Oilfield's Claim 28-1 on April 29, 2021. *See* Doc. 354. Mean Oilfield amended

its claim on May 19, 2021 and responded to TCS's objection to its claim on May 20, 2021. *See* Claim 28-2 and Doc. 383. TCS and Mean Oilfield stipulated that Mean Oilfield's claim will be treated as timely filed, and that, if the Court finds that Mean Oilfield's claim should be allowed, the allowed claim will be treated in the same manner and paid at the same rate as all other allowed non-priority unsecured claims as provided in TCS's chapter 11 plan of reorganization ("Plan"–Doc. 338). *See* Doc. 391.[1] TCS confirmed its Plan on May 27, 2021. *See* Doc. 397.

Following a preliminary hearing on the Claim Objection, the Court issued a scheduling order that set a final hearing on the Claim Objection limited to the threshold issue of whether TCS is a guarantor of Mean Carlsbad's debt to Mean Oilfield. *See* Doc. 410.[2] The Court took the threshold issue under advisement following an evidentiary hearing.

## FACTS

TCS is in the business of cleaning water from oil produced from oil wells in Southern New Mexico. *See* Disclosure Statement–Doc. 337. It has been in operation since 2010. *Id.* Abraham Carranza, who lives in Lubbock, TX, is the principal and 100% owner of Mean Oilfield. Melissa Acosta is the 100% owner of TCS. Mean Carlsbad is another entity created by Ms. Acosta in 2014. Mean Carlsbad sells oilfield supplies. When Mean Carlsbad was initially formed, TCS and Mean Oilfield each held a 50% interest in Mean Carlsbad. *See* Exhibit B.

---

[1] TCS's Plan provides for payment of 100% all allowed non-priority unsecured claims through monthly payments of $25,000, beginning in the sixty-first month of the Plan, prorated across all allowed nonpriority unsecured claims until such claims are paid in full. Plan, Article II, Section 2.1–Treatment of Class V allowed general non-priority unsecured claims.

[2] As part of its Claim Objection, TCS states that Mean Oilfield filed a lawsuit against Mean Carlsbad and TCS in state court in the fall of 2020 that resulted in a default judgment in favor of Mean Oilfield, and that Mean Carlsbad has requested that the judgment be set aside so that it may present its defenses in the state court. After the Claim Objection was filed, the parties stipulated that the state court set the default judgment aside on May 18, 2021. *See* Doc. 391.TCS contends that the amount of Mean Oilfield's claim against TCS in this bankruptcy case cannot be determined until the state court determines whether Mean Carlsbad owes any money to Mean Oilfield. That portion TCS's objection to Mean Oilfield's claim is not now before the Court.

Sometime in 2017 Ms. Acosta and Mr. Carranza got into a dispute over the operation of Mean Carlsbad. Both Ms. Acosta and Mr. Carranza felt that Mean Carlsbad was not being operated properly. Mr. Carranza wanted out of Mean Carlsbad. In an effort to resolve their dispute, Mean Carlsbad agreed to redeem Mean Oilfield's 50% interest in Mean Carlsbad for $300,000.

Mr. Carranza's attorney prepared the following documents to complete the transaction:

Promissory Note–Redemption Funding (Exhibit A)
Redemption Agreement (Exhibit B)
Licensing Agreement (Exhibit C)
Guaranty Agreement (Exhibit E)[3]

Promissory Note. The Promissory Note in the principal amount of $300,000 reflects that Mean Carlsbad is the borrower, and Mean Oilfield is the lender. Melissa Acosta and Cesar Hinojos[4] executed the Promissory Note on behalf of Mean Carlsbad on page 2 of the Promissory Note. The Promissory Note includes the following provision on the first page under a heading entitled Security:

> Borrower and Lender agree that this Note shall be secured by the Guaranty of Trucking & Contracting Services, LLC, attached and incorporated herein by reference.

Redemption Agreement. The Redemption Agreement, on pages. 2-3, also references TCS's guarantee. *See* Exhibit B, ¶ 3.2(e). Section 3.2 of the Redemption Agreement provides:

> Mean Oilfield covenants and warrants that the execution of this Agreement confirms and constitutes valid acceptance of the following agreements, exhibits, and documents attached hereto, and incorporated herein:
>
> a. Mean Oilfield Carlsbad, LLC Redemption Agreement:
> b. Promissory Note–Redemption Funding
> c. Promissory Note–Amortization Schedule
> d. Licensing Agreement
> e. Guaranty Agreement–Trucking & Contracting Services, LLC

---

[3] A Loan Amortization Schedule was also prepared (Exhibit D), but the parties agreed that Exhibit D need not be admitted into evidence as part of the Claim Objection.
[4] Cesar Hinojos is Ms. Acosta's former spouse.

Melissa Acosta and Cesar Hinojos executed the Redemption Agreement on behalf of Mean Carlsbad on page 4 of the Agreement.

Guaranty Agreement. The Guaranty Agreement (Exhibit E) includes the following recital on the first page:

> WHEREAS, Lender [Mean Oilfield] has conditioned its obligation to make a Loan in part upon obtaining from TRUCKING & CONTRACTING SERVICES, LLC ("Guarantor") this Guaranty Agreement ("Agreement").

The signature block for the Guarantor is as follows:

> GUARANTOR:
>
> MEAN OILFIELD CARLSBAD, LLC
>
> By:_____
> Melissa Acosta
> Its:_____
>
>
> By:_____
> Cesar Hinojos
> Its:_____

Melissa Acosta signed the Guaranty Agreement in the signature block on page 3 of the Guaranty Agreement.[5] The notary block for Melissa Acosta on page 4 of the Guaranty Agreement is as follows:

> THE STATE OF _____    )
>                        )
> COUNTY OF _____    )
>
> This instrument was acknowledged before me on the __ day of May, 2017 by MELISSA ACOSTA, _____ of TRUCKING AND CONTRACTING SERVICES, LLC, in the capacity herein stated.

---

[5] The Guaranty Agreement also reflects the signature of Cesar Hinojos on behalf of Mean Carlsbad. *See* Exhibit E. Like the notary block for Ms. Acosta, the notary block for Cesar Hinojos reflects that he is signing the instrument on behalf of TCS. *Id.*

_____

NOTARY PUBLIC, STATE OF _____

Conflicting Testimony. Most, if not all, of Mr. Carranza's testimony regarding the parties' understanding of their agreement regarding the stock redemption transaction, the preparation of transaction draft documents, and the execution of the transaction documents, directly conflicts with Ms. Acosta's testimony on the same subjects. Mr. Carranza testified that he and Ms. Acosta negotiated back and forth regarding the stock redemption over several months and that his attorney exchanged draft transaction documents with Ms. Acosta's attorney, with redlined draft documents, though he did not recall whether the attorneys talked to each other.[6] Ms. Acosta testified that Mr. Carranza or someone on his team prepared the transaction documents, that she did not prepare the documents, and that no one prepared the documents on her behalf. Ms. Acosta testified further that, to her knowledge, her attorney did not review the transaction documents. No written evidence of any communications between the attorneys or copies of redlined drafts of the transaction documents were offered into evidence. Neither attorney testified at the hearing.

Mr. Carranza testified further that he had conversations with Ms. Acosta regarding TCS's guarantee of Mean Carlsbad's obligation to Mean Oilfield, that he originally wanted Ms. Acosta to sign a personal guaranty in addition to TCS, but that they ultimately agreed that only TCS would guarantee the Promissory Note. Ms. Acosta testified that she did not have a conversation with Mr. Carranza about TCS guaranteeing Mean Carlsbad's debt to Mean Oilfield. Ms. Acosta

---

[6] By reporting on the testimony of a witness the Court is not making a finding whether the testimony is true.

insists that she would not have gone forward with the transaction if it required TCS to guarantee the debt of Mean Carlsbad.

As for the execution of the documents, Mr. Carranza testified that he, Ms. Acosta, Mean Carlsbad's CPA, and the notary were all present in Ms. Acosta's office when the documents were signed. Ms. Acosta testified that her accountant, Eric Osunas, brought the documents to her office and she signed them, but that Mr. Carranza was not present.

<u>Other Evidence</u>. Ms. Acosta testified that she did not see the transaction documents before they were presented to her for signature. She testified further that she did not read any of the transaction documents before she signed them, that when she signed the transaction documents, including the Guaranty Agreement, she saw that she was signing each document on behalf Mean Carlsbad, and that she would not have signed a document if it showed she was signing on behalf of TCS.

Ms. Acosta testified that she relied on her accountant, Eric Osunas, with respect to her signing the documents. Mr. Eric Osunas did not testify at the hearing. Ms. Acosta testified that it never occurred to her that it made no sense for Mean Carlsbad to sign a Guaranty of a debt owed by Mean Carlsbad. No evidence was presented regarding Ms. Acosta's level of sophistication with respect to commercial transactions.

The Court finds that the testimonial evidence and other evidence regarding whether the parties mutually intended that TCS would guarantee Mean Carlsbad's debt to Mean Oilfield is inconclusive and is insufficient to enable the Court to make a finding, under either a clear and convincing or preponderance of the evidence standard, regarding whether the parties had such a mutual intent.

DISCUSSION

A. *Burden of Proof*

1. Claim Objection in a Bankruptcy Case.

A properly filed proof of claim "constitute[s] prima facie evidence of the validity and amount of the claim." Fed.R.Bankr.P. 3001(f). Such a claim is deemed allowed unless a party in interest objects. *See* 11 U.S.C. § 502(a). The objecting party bears the initial burden of presenting evidence in support of the objection. *In re Geneva Steel Co.*, 260 B.R. 517, 524 (10th Cir. BAP 2001) (citing *Abboud v. Abboud (In re Abboud)*, 232 B.R. 793, 796 (Bankr. N.D. Okla.), *aff'd,* 237 B.R. 777 (10th Cir. BAP 1999)), *aff'd,* 281 F.3d 1173 (10th Cir. 2002). Once that threshold has been met, "the creditor has the ultimate burden of persuasion as to the validity and amount of the claim." *Id.* (citing *In re Harrison*, 987 F.2d 677, 680 (10th Cir. 1993)).

The issue before the Court is whether TCS guaranteed a debt owed by Mean Carlsbad to Mean Oilfield under the Guaranty Agreement. TCS met its initial burden of going forward with its objection to Mean Oilfield's claim under the Guaranty Agreement by putting into evidence the Guaranty Agreement, which bears Ms. Acosta's and Mr. Hinojos' signatures on behalf of Mean Carlsbad, not TCS, together with evidence that Ms. Acosta did not intend to bind TCS by signing the Guaranty Agreement on behalf of Mean Carlsbad. By TCS satisfying its burden of going forward, the ultimate burden of persuasion shifted to the claimant, Mean Oilfield.

2. Claim of Reformation under New Mexico Law

Mean Oilfield seeks to reform the Guaranty Agreement to reflect that TCS is the guarantor. The bankruptcy court looks to state law to construe a contract such as the Guaranty Agreement. *Weinman v. Allison Payment Sys., LLC (In re Centrix Fin., LLC)*, 434 B.R. 880, 884 (Bankr. D. Colo. 2010) (citing *Butner v. United States*, 440 U.S. 48, 55 (1979)). Mean Oilfield's claim based on the Guaranty Agreement is governed by New Mexico law. Under New Mexico law, "[t]he party seeking to reform a writing [based on mutual mistake] must prove by clear and

convincing evidence that a mutual mistake occurred."[7] "For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true."[8]

      B.      *Reformation of Contract based on Mutual Mistake/Scrivener's Error*

Under New Mexico law, a court may reform a contract where "the written instrument drafted to evidence a contract fails to express the real agreement and intentions of the parties" as a result of either a mutual mistake of the parties, or a unilateral mistake by one party and fraud or inequitable conduct on the part of the other party. *Buck v. Mountain States Inv. Corp.*, 1966-NMSC-090, ¶ 7, 76 N.M. 261, 264, 414 P.2d 491, 493 (citations omitted). *See also Ballard v. Chavez*, 1994-NMSC-007, ¶ 7, 117 N.M. 1, 2, 868 P.2d 646, 647 ("Mutual mistake is grounds for contract reformation in New Mexico.") (citations omitted).[9] In applying the doctrine of reformation based on mutual mistake, New Mexico follows Restatement (Second) of Contracts, § 155 (1981),[10] which provides:

> Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may, at the request of a party reform the writing to express the agreement, except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected.

---

[7] *Twin Forks Ranch, Inc. v. Brooks*, 1998-NMCA-129, ¶ 8, 125 N.M. 674, 677, 964 P.2d 838, 841 ("*Twin Forks II*") (citing *Butler v. Butler,* 1969-NMSC-021, ¶ 8, 80 N.M. 36, 38, 450 P.2d 922, 924 and *Wright v. Brem,* 1970-NMCA-030, ¶ 6, 81 N.M. 410, 411, 467 P.2d 736, 737). *See also In re Crowder*, No. 7-96-10336 ML, 2008 WL 5157861, at *4 (Bankr. D.N.M. Aug. 29, 2008) ("The party who seeks to reform a contract based on mutual mistake bears the burden of proving the mistake by clear and convincing evidence.") (citing *Collier v. Sage*, 1947-NMSC-025, ¶ 6, 51 N.M. 147, 150, 180 P.2d 242, 243) (remaining citations omitted)).
[8] *Id.* (quoting *In re Sedillo,* 1972-NMSC-050, ¶ 13, 84 N.M. 10, 12, 498 P.2d 1353, 1355).
[9] A unilateral mistake by one party to a contract can serve as grounds for reformation, but only if the mistake is the result of fraud or other inequitable conduct by the other party to the contract. *Christy v. Travelers Indem. Co. of Am.*, 810 F.3d 1220, 1226 n. 4 (10th Cir. 2016) ("For unilateral mistake, reformation is appropriate under New Mexico law only if the mistake is accompanied by fraud or other inequitable conduct on the part of the nonmistaken party.") (citing *Chromo Mountain Ranch P'ship v. Gonzales*, 1984-NMSC-058, ¶ 7, 101 N.M. 298, 681 P.2d 724, 725).
[10] *See Twin Forks II*, 125 N.M. at 677 (quoting and applying Restatement (Second) of Contracts § 155 (1981)).

-8-

Case 19-11319-j11    Doc 435    Filed 12/06/21    Entered 12/06/21 16:36:16 Page 8 of 14

In other words, "[a] mutual mistake occurs when the parties have reached an agreement, but the writing either does not express what was really intended, or has achieved what neither party intended." *Twin Forks Ranch, Inc. v. Brooks*, 1995-NMCA-128, ¶ 11, 120 N.M. 832, 835, 907 P.2d 1013, 1016 ("*Twin Forks I*") (citations omitted). "[R]eformation is proper only when the party seeking reformation can prove both mutual mistake in the writings and the content of the parties' true agreement." *Twin Forks II*, 125 N.M. at 678. "A party's unilateral intent or belief is insufficient to establish a mutual mistake."[11]

Mean Oilfield asks the Court to reform the Guaranty Agreement, not based on fraud or inequitable conduct, but based on a scrivener's error in the signature block of the Guaranty Agreement. Mean Oilfield argues that it is clear that the identification of Mean Carlsbad as the guarantor in the signature block is a mere scrivener's error because the body of the Guaranty Agreement and the related transaction documents all identify TCS as the guarantor.

Reformation based on a scrivener's error requires that the party seeking reformation establish that because of a mistake by the drafter of the agreement the written agreement failed to document what the parties mutually intended and agreed.[12] In *Points v. Wills*, 1939-NMSC-041, ¶ 11, 44 N.M. 31, 97 P.2d 374, 378, the New Mexico Supreme Court explained: "Where there is no mistake as to the terms of an agreement, but through a mistake of the scrivener . . . the

---

[11] *R T Elec. Inc. v. Skilled Site Servs., Inc.*, No. CIV-99-1409 LCS-ACE, 2000 WL 36739466, at *4 (D.N.M. Dec. 20, 2000) (citing *Hanson v. Ford Motor Co.*, 1995-NMSC-944, ¶ 12, 120 N.M. 203, 206, 900 P.2d 952, 955 (1995)). *See also Ricks Expl., Inc. v. Cross Timbers Oil Co.,* 25 F. App'x 690, 698 (10th Cir. 2001) ("'[T]he question of mutual mistake is determined not by self-serving subjective statements of the parties' intent' . . . but, instead by objective manifestations of the parties' intent.") (quoting *Williams v. Glash*, 789 S.W.2d. 261, 264 (Tex. 1990) and applying Texas law).
[12] *TDY Indus., LLC v. BTA Oil Producers, LLC*, No. 2:18-CV-0296-SWS/MLC, 2019 WL 4014852, at *6 (D.N.M. Feb. 15, 2019) (like reformation based on mutual mistake, reformation based on a scrivener's error "seek[s] to correct an error made in a writing that does not reflect the intention of the parties") (citations omitted); *Cleveland v. Bateman*, 1915-NMSC-090, ¶ 8, 21 N.M. 675, 158 P. 648, 650) (reformation due to scrivener's error is based on a mistake by the draftsman in reducing the parties' agreement to writing).

instrument does not express the agreement actually made, it may be reformed by the court . . . ." (quoting *Born v. Schrenkeisen*, 110 N.Y. 55, 17 N.E. 339 (1888)). *See also* 27 Williston on Contracts § 70:93 (4th ed. 2018) ("[A] scrivener's error, like a mutual mistake, occurs when the intention of the parties is identical at the time of the transaction but the written agreement does not express that intention because of that error; this permits a court acting in equity to reform and agreement."). Reformation based on scrivener's error is a form of reformation based on a mutual mistake of the parties in the sense that the parties signed the agreement mistakenly believing it reflected their mutual intention and agreement. *Cf. Cleveland v. Bateman*, 1915-NMSC-090, ¶ 10, 21 N.M. 675, 158 P. 648, 650 (reformation of a contract containing a scrivener's error must be based on a mutual mistake).

  C.  *Mean Oil Has Not Satisfied its Burden of Proof*

Mean Oilfield points out that the Guaranty Agreement clearly identifies TCS as the guarantor, and that other documents to the transaction, including the Promissory Note and the Redemption Agreement, refer to a guarantee to be executed by TCS. Mean Oilfield also points out that it would make no sense for Mean Carlsbad to guarantee a debt for which it was already liable under the Promissory Note, and argues that Ms. Acosta therefore must have known that the signature block in the Guaranty Agreement contained a drafting error. Mean Oil reasons that the transaction documents, coupled with Mr. Carranza's testimony that Ms. Acosta understood that TCS would be required to guarantee the debt and the absurdity of an obligor guaranteeing its own obligation, shows that the error in the signature block is an obvious scrivener's error justifying reformation. TCS counters that there was no mutual mistake justifying reformation because Ms. Acosta never understood or agreed that TCS would be liable for Mean Carlsbad's

-10-

debt to Mean Oilfield, and Ms. Acosta would not have signed the Guaranty Agreement had she known that TCS would be the guarantor.

The Court agrees that the error in the signature block in the Guaranty Agreement showing Mean Carlsbad instead of TCS as the signatory is a scrivener's error. It directly conflicts with the rest of the content of the Guaranty Agreement. It also conflicts with the Promissory Note and Redemption Agreement, and it makes no sense that a borrower would guarantee its own debt. The Court is also convinced that Mr. Carranza understood that TCS would be the guarantor. However, it is not enough for Mean Oilfield to show there was a scrivener's error and a uniliteral mistake by Mean Oilfield. Reformation of the Guaranty Agreement based on a scrivener's error in the signature block requires Mean Oilfield to establish that because of a mistake by the drafter of the Guaranty Agreement the written agreement failed to document what the parties mutually intended and agreed. Mean Oilfield has failed to make that showing.

The testimonial evidence regarding whether the parties mutually intended that TCS would guarantee Mean Carlsbad's debt to Mean Oilfield is inconclusive. Mr. Carranza's and Ms. Acosta's testimony regarding their mutual intention that TCS would guarantee Mean Carlsbad's debt to Mean Oilfield is directly in conflict. Mr. Carranza testified that he and Ms. Acosta discussed the required TCS guarantee, and that Ms. Acosta knew TCS would be required to guarantee the Mean Carlsbad debt to Mean Oilfield in order for Mean Oilfield to finance the redemption of Mean Oilfield's 50% interest in Mean Carlsbad on credit. Ms. Acosta, on the other hand, testified that she never discussed TCS guarantying the debt with Mr. Carranza and insisted that when she signed the Guaranty Agreement she believed she was only obligating Mean Oil since the signature block said she was signing on behalf of Mean Carlsbad. Ms. Acosta testified that she never would have agreed to sign the Guaranty Agreement had she known that TCS

would be the guarantor. Ms. Acosta testified she signed the Guaranty Agreement because she understood based on the signature block she was signing on behalf of and only obligating Mean Carlsbad. She testified that she did not learn TCS would be the guarantor from the transaction documents because she did not read them. Ms. Acosta also testified that that it never occurred to her that it made no sense for a borrower to guarantee its own debt.

The Court is aware that conflicting testimony regarding the parties' intent does not preclude the Court from concluding that a mutual mistake exists sufficient to reform the Guaranty Agreement. *See First Nat'l Bank of Englewood v. Iliff Builders Supply Co.*, 531 P.2d 407, 411–12 (Colo. App. 1974) ("[T]he fact that there is conflicting testimony will not preclude the granting of relief [for reformation of contract based on a mutual mistake].") (citing *Eisele v. Barnhart*, 55 P.2d 321). However, the party seeking reformation must prove that reformation is appropriate based on clear and convincing evidence. *Collier v. Sage*, 51 N.M. at 150 ("[T]he proof must be of the clearest and most satisfactory character."); *Pacheco v. Martinez*, 1981-NMCA-116, ¶ 30, 97 N.M. 37, 43, 636 P.2d 308, 314 (clear and convincing standard of proof) (citations omitted); *Twin Forks II*, 125 N.M. at 677 (clear and convincing). The testimonial evidence regarding whether the parties mutually intended that TCS would guarantee Mean Carlsbad's debt to Mean Oilfield is inconclusive and is insufficient to enable the Court to make a finding regarding whether the parties had such a mutual intent.

The Court will not make a finding of mutual intent by imputing knowledge of the scrivener's error to Mean Carlsbad based on the general rule that a party is bound to the terms of a contract even if the party did not read the contract before signing. Ordinarily, a party to a contract is bound to have read and understood the contents of a contract and will be bound by its

terms even the party did not read the contract.[13] But under the doctrine of reformation, a party to a contract asks the court to reform the document so the parties are not bound to the contract as written. It is an exception to the general rule that a party is bound to the terms of a contract even if the party did not read the contract before signing.[14] Had Ms. Acosta read the transaction documents, she would have seen that the Guaranty Agreement clearly identifies TCS as the guarantor in the body of the document, and the Promissory Note and Redemption Agreement likewise reference the TCS Guaranty Agreement. Had Mr. Carranza carefully read the Guaranty Agreement, he would have caught the scrivener's error in the signature block and corrected the error before the documents were presented to Ms. Acosta to sign.

When a court is unable to make findings based on the conflicting testimony of who witnesses, other evidence often tips the scale, such as documentary evidence or testimony from other witnesses. But here there is no other evidence that tips the scale to enable the Court to make a finding regarding the parties' mutual intent. The was no evidence regarding the level Ms. Acosta's sophistication in commercial transactions to enable the Court to assess the credibility of her testimony that that it never occurred to her that it made no sense for a borrower to guarantee its own debt. Mr. Carranza testified that his lawyer and Ms. Acosta's lawyer negotiated the transaction documents and exchanged drafts, including redlined documents. But neither lawyer

---

[13] *Ballard v. Chavez*, 117 N.M. at 3 ("[E]ach party to a contract has a duty to read and familiarize himself with the contents of the contract, each party generally is presumed to know the terms of the agreement, and each is ordinarily bound thereby.") (citing *Smith v. Price's Creameries, a Div. of Creamland Dairies, Inc.*, 1982-NMSC-102, ¶ 13, 98 N.M. 541, 545, 650 P.2d 825, 829 (1982)); *State ex rel. State Highway & Transp. Dep't v. Garley*, 1991-NMSC-008, ¶ 36, 111 N.M. 383, 391, 806 P.2d 32, 40 ("Each party to a contract has a duty to read and familiarize himself with its contents before he signs and delivers it, and if the contract is plain and unequivocal in its terms, each is ordinarily bound thereby.") (quoting *Smith v. Price's Creameries*, 98 N.M. at 545).

[14] *See Ballard v. Chavez*, 117 N.M. at ("[W]hen reformation based upon mutual mistake is appropriate, reformation is an exception to the general rule that parties will be bound to the terms of their express, written contracts and will not be excused from their duty to know these terms.") (citing *Garley*, 111 N.M. at 391).

testified and no redlined drafts were offered into evidence. Ms. Acosta testified that she relied on her accountant, Eric Osunas, with respect to her signing the documents. Mr. Eric Osunas did not testify at the hearing. It is unclear to the Court whether additional evidence would have shed any light on whether TCS agreed to guarantee the Promissory Note. But without additional evidence of the parties' mutual intent, the party bearing the burden of proof will not prevail.

Based on the evidence now before the Court, the Court concludes that Mean Oilfield has not demonstrated that the scrivener's error in the Guaranty Agreement failed to document what the parties mutually intended and agreed.

## CONCLUSION

Based on the foregoing, the Court concludes that the Guaranty Agreement cannot be reformed to obligate TCS based on a scrivener's error. Mean Oilfield did not meet its burden of proving either by clear and convincing evidence or by a preponderance of the evidence that the parties agreed that TCS would guarantee the debt of Mean Carlsbad and that the scrivener's error in identifying Mean Carlsbad as the guarantor did not document the parties' mutual agreement. The Court will sustain TCS's Claim Objection and enter a separate order consistent with this Memorandum Opinion disallowing Mean Oilfield's claim against TCS in its entirety.

/s/ Robert H. Jacobvitz
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: December 6, 2021

COPY TO:

P. Diane Webb
Attorney for Debtor
PO Box 30456
Albuquerque, NM 87190-0456

Andrew Bradley Curtis
Attorney for Mean Oilfield, LLC
Bigbee & Curtis, LLP
P.O. Box 53086
Lubbock, TX 79423